UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE:

ROBERTS, JONATHAN PASCAL,                    CASE NO. 13-30738-KKS
ROBERTS, VENUS AYN.                          CHAPTER 7

     Debtors.

_____/

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER SUSTAINING TRUSTEE'S OBJECTION TO DEBTORS' CLAIM OF HOMESTEAD EXEMPTION (DOC. 37)

The Debtors are a married couple who now live, with their three children, in a waterfront home that they constructed in 2009 using cash from several non-exempt sources. When they filed this Chapter 7 they listed this home and property (the "Current Home") as their exempt homestead under Article X, Section 4 of Florida's Constitution. After taking the Debtors' testimony at the § 341 meeting about the sources of funds for construction of the Current Homestead, the Chapter 7 Trustee filed an objection to the Debtors' claim of homestead exemption under 11 U.S.C. § 522(o)(4), to which the Debtors filed a Response in opposition.[1] The matter was tried before the Court on September 16 and 17, 2014. After the trial, each side submitted proposed Findings of Fact and Conclusions of Law, and filed responses to the opposing party's proposed findings.[2]

The issue before the Court is whether the Debtors' homestead exemption should be reduced in an amount equal to the value of non-exempt assets the Debtors liquidated within ten years pre-petition pursuant to 11 U.S.C. § 522(o)(4). The result depends on whether the Debtors' liquidation of their non-exempt assets and construction of their "dream home" while on the verge of defaulting on significant commercial debt was purely coincidental; or whether the Debtors

---

[1] Docs. 37, 42.
[2] Docs. 77, 79, 80, and 81.

acted with intent to hinder, delay or defraud creditors.  Having carefully reviewed all of the evidence and testimony, as well as the parties' legal memoranda, proposed Findings of Fact and Conclusions of Law and argument of counsel, the Court finds that the Trustee's Objection to the Debtors' homestead exemption should be sustained.

<u>Introduction and Summary</u>

The Debtors filed their Chapter 7 petition on June 7, 2013; they listed the equity in their Current Home as exempt on their Schedule C.[3]  The Current Home is encumbered by only one mortgage, with a balance of $121,411.50 as of the petition date.[4]  The Trustee objected to the Debtors' claimed homestead exemption, asserting that the equity in the Current Home is a "product of careful design" by the Debtors that was specifically created with the intent to hinder, delay or defraud creditors.[5]  This is proven, argues the Trustee, by the fact that while faced with significant liability to two creditors, BB&T and SunTrust Mortgage ("SunTrust"), the Debtors liquidated their non-exempt assets and used that money to build their "dream home," which is their Current Home, thus rendering their assets immune from creditors and rendering themselves insolvent.[6]

The Debtors admit to building their Current Home with proceeds from primarily non-exempt assets, but deny any evil or unsavory intent. All they did, say the Debtors, was fulfill their goal of finally building and moving into their "dream home" on a lot that they had owned for

---

[3] Doc. 1, Schedule C.  Debtors claim their homestead exemption under Florida law, specifically Article X, § (4)(a)(1) of the Florida Constitution; and sections 222.01 and 222.02 of the Florida Statutes.

[4] The Debtors claimed an exemption on the Current Home in the amount of $328,588.50, which is the $450,000 scheduled value, less the mortgage balance.  Doc. 1, Schedule C.  The mortgage debt represents the balance remaining from the original purchase price of the lot of $240,000.00.  Debtors' Current Home is at 313 Amelia Lane, Walton County, Florida.  Their "Former Homestead" is at 611 Amelia Lane Walton County, Florida.

[5] Specifically, the Trustee claims that Debtors intended to hinder, delay or defraud two main creditors, SunTrust Mortgage and Branch Banking and Trust Company ("BB&T").

[6] On March 11, 2009, the Debtors sold a vacant lot for $80,000. Doc. 74, ¶ 25.  On May 14, 2009, the Debtors sold a vacant lot for $30,000. *Id.* at ¶ 31.  Sometime in 2009, the Debtors sold a Sea Ray recreational vessel for $50,000. *Id.* at ¶ 32. On February 8, 2010, Big Fish sold a vacant lot for $25,000. *Id.* at ¶ 51.  The Debtors admit that they used the proceeds from all of these sales for the construction of their Current Homestead.  The Debtors also admitted to using $209,875.28 of funds from their Regions Bank Money Market Account. *Id.* at ¶ 23.

several years.  They argue that the appraisals of the collateral for the largest BB&T loan always showed that there was equity in that property, which proves that they were not rendered insolvent as a result of their transfers.  They point out that BB&T did not file suit against them until after they had completed construction on their Current Home.  As to SunTrust, the Debtors argue that even though they were facing a potential $200,000 deficiency, because they told SunTrust they had a new mailing address and listed their Current Home on a financial statement, the Trustee cannot prove that they acted with intent to hinder, delay or defraud.

<u>Findings of Fact</u>

Jonathan Roberts is a sophisticated real estate professional who, following in his father's footsteps, has had significant experience as a developer.[7]  After graduating college with a degree in Sociology in 1997 he became a real estate agent;[8] he acquired his real estate broker's license in 2006.[9]  In his 17-year career, Mr. Roberts has been involved in hundreds of sales transactions for his clients and has ranked among the top real estate agents in and around Walton County, Florida.[10]  Mr. Roberts holds accreditation from the "Graduate Realtor Institute" (GRI), which he testified involves numerous continuing education classes, and a Loss Mitigation Certification from the Florida Association of Realtors which signifies specialized education in dealing with lenders and distressed loans.[11]

Venus Roberts is an interior designer who also works with her husband, assisting with day-to-day support in the real estate businesses as well as raising their three children.[12]  Together the Debtors have engaged in approximately twenty-four (24) personal real estate transactions for

---

[7] Doc. 78-1, at 25-26.
[8] *Id.* at 25.
[9] *Id.*
[10] *Id.*
[11] Doc. 78-2, Trial Tr. Vol. II, at 8-9, 51-52.
[12] Doc. 77, at 3; Doc. 78-2, at 13.

profit since 1997, including buying and selling condominiums, homes, town homes, vacant lots, new construction, remodels, and commercial properties, and continue to do so today.[13]  Since 1997, it has not been uncommon for the Debtors to sell property and use the funds for living expenses, but the only transactions involving their personal residences have taken place since 2002 and 2003, when they bought a lot and built their Former Homestead.[14]

At all material times, the Debtors have also been in the business of developing and selling commercial real estate.[15]  Their commercial entities include JR Investments, LLC ("JR Investments") and Big Fish Properties, LLC ("Big Fish").[16]  In 2003 and 2005, respectively, the Debtors obtained commercial loans for Big Fish and JR Investments from BB&T's predecessor, Colonial Bank.[17]  The Big Fish loan, secured by two residential lots in Walton County, Florida, originated on December 3, 2003, and had an original maturity date of December 3, 2005.[18]  The JR Investments loan originated on September 30, 2005, and was secured by a parcel of land in Walton County, Florida known as "Lot 58 Seabreeze," which the Debtors purchased for $750,000.00.[19]  The Debtors sought to develop and sell the Big Fish and JR Investments properties.[20]

---

[13] Doc. 78-2, at 9.

[14] *Id.* at 11.

[15] Doc. 74, at 2.

[16] Doc. 71, ¶ 1.  The Debtors owned and operated other entities, none of which are relevant to the issue here.

[17] Doc. 71, ¶ 3. The Debtors dealt directly with Colonial Bank on these loans until August 14, 2009, when BB&T became successor in interest to Colonial Bank.  On August 14, 2009, the Alabama State Banking Department took possession of the business and property of Colonial Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver to liquidate and distribute the assets of Colonial Bank. *Id.* at ¶ 8-9.  The FDIC accepted this appointment as receiver in accordance with the Federal Deposit Insurance Act and, in its capacity as receiver for Colonial Bank, the FDIC entered into an "Assignment of Security Instruments and Other Loan Documents (hereinafter "Assignment Agreement"), as "Assignor," with Branch Banking and Trust Company ("BB&T"), as "Assignee." *Id.* at ¶ 4. Under the Assignment Agreement, the FDIC assigned all rights, title and interests to BB&T in and to the commercial loans made to JR Investments and Big Fish which were owned by Colonial Bank as of August 14, 2009. *Id.* at ¶ 5.  The loan documents regarding JR Investments and Big Fish that originated with, were executed in favor of, or executed by, BB&T's predecessor in interest, Colonial Bank, will be referred to as if said instruments were executed and delivered to BB&T, or executed by BB&T. *Id.* at ¶ 3.

[18] *Id.* at ¶¶ 4, 8-9; Doc. 78-1, at 57. The Big Fish Properties Note was an interest-only note.

[19] Doc. 71, at ¶ 2.

[20] *Id.* at ¶¶ 13-14.

<u>Construction of the Current Home</u>
<u>And Its Application to 11 U.S.C. § 522(o)(4)</u>

Sometime in 2004 or 2005, the Debtors purchased the lot on which they built their Current Home; the purchase price was $240,000.00.[21] The Debtors testified that this was to be the site of their dream home, which would accommodate their growing family.[22] Shortly after purchasing the lot they hired an architect to design house plans.[23] Because they had a child later that year, and Ms. Roberts was not satisfied with the house plans, they did not pursue further plans or home-building at that time.[24] In early April of 2009, after re-working the house plans the Debtors obtained a building permit, recorded a Notice of Commencement and began construction of their Current Home.[25]

At the end of February 2009, a little over a month before starting construction on their Current Home, the Debtors executed a two-year renewal of the $750,000.00 JR Investments loan with BB&T, extending the maturity to February 27, 2011.[26] On April 20, 2009, twelve days after beginning construction on their Current Home, they signed a two-year renewal of the Big Fish loan, extending the maturity date of that loan to February 27, 2011.[27] By June of 2009, the Debtors had expended at least $155,000 in cash building the Current Home, which was more than 60% complete.[28] That same month, the Debtors stopped making payments on the JR Investments and

---

[21] Mr. Roberts gave conflicting testimony as to when the Debtors purchased the lots on which they built their first home and the Current Home. At one point he testified that they purchased the lot for the Current Home in January of 2004. Doc. 78-1, at 41. He testified that they bought the lot on which they built their first home on Amelia Lane in 2002 and began construction of the home on that lot in 2003. Doc. 78-2, at 11. He then testified that they bought the lot for their Current Home in 2005. Doc. 78-2, at 12.

[22] Doc. 78-1, at 48.

[23] Doc. 78-2, at 13.

[24] *Id.* at 60.

[25] Doc. 78-1 at 36-37. The Notice of Commencement was recorded on April 8, 2009.

[26] Doc. 71, ¶ 24.

[27] *Id.* at 27. The Big Fish and JR Investments loans had both been renewed every year or two since they originated in 2003 and 2005, respectively.

[28] Doc. 78-1, at 48-49, 74; Doc. 78-2, at 16-17. During trial testimony Mr. Roberts quibbled with counsel for the

Big Fish loans.[29]

In July of 2009, while the Debtors continued liquidating assets and building their Current Home, and while continuing to reside in their Former Homestead on which SunTrust held the only mortgage, the Debtors responded by phone to information from SunTrust regarding the possibility of a short sale.[30]  On July 14, 2009, SunTrust sent them a letter acknowledging receipt of their request for approval of a short sale and outlining the "Short Sale Package Requirements."[31] Among other things, the letter made clear that SunTrust required a "signed and dated hardship letter," defined as "an explanation of why the homeowner is unable to pay the mortgage."[32]

In August of 2009, BB&T sent the Debtors written demands for payment of the Big Fish and JR Investments loans.[33]  These letters gave the Debtors an opportunity to cure the defaults by making the two missed payments on each loan within 10 days.[34]  The amount necessary to cure the default for the Big Fish loan was $2,748.31; the amount needed to cure the default on the JR Investments loan was $11,364.08.[35]  The Debtors did not cure the defaults on the BB&T loans. Instead, they retained an attorney, Shannon Widman, who they described as a specialist in loan workouts, to respond to the BB&T demand letters on their behalf.[36]  Based on information that the Debtors had provided her about their financial affairs, Ms. Widman wrote to BB&T's lawyers on August 31, 2009, saying:

> At this time, my clients are financially disadvantaged and are unable to pay the
> past due interest and late fees and are otherwise unable to sustain any further

---

Trustee about this, but finally admitted that based on the invoice of charges prepared by the general contractor on the job, he and his wife had already "become obligated" for this amount in construction costs by July of 2009.  *Id.* at 48-50.
[29] Doc. 71, ¶ 36.  The monthly payments on both were due June 27, 2009.
[30] Doc. 78-1, at 30-31, 50; Doc. 71, ¶ 37; Debtors' Ex. 96, 97.
[31] Debtors' Ex. 96, 97.
[32] *Id.*
[33] Doc. 78-2, at 68-70; Trustee Ex. 4, at 24-27, and Trustee Ex. 5, at 27-29.
[34] *Id.*
[35] *Id.*
[36] Doc. 78-2, Trial Tr. Vol. II, at 29-30.

payments on these loans.[37]

When they received the BB&T demand letters, and at the time Ms. Widman wrote her letter, the Debtors were still in the process of liquidating their assets and building their Current Home. As evidenced by an itemized statement from their general contractor, the Debtors spent $385,595.24 on the construction of the Current Home from March through December 2009.[38]

The Debtors called Ms. Widman as a witness at trial.[39]  On cross-examination by the Trustee's counsel about the representations in her August 31, 2009, letter to counsel for BB&T, Ms. Widman testified:

> Q.  As of that date, you stated that your clients were financially disadvantaged and were unable to pay the past-due interest and the late fees and were otherwise unable to sustain any further payments on these loans; is that correct?
>
> A. That is what I said.
>
> Q. So at that time, your clients had told you that they were essentially not able to service the debt either on the JR Investments loan or the Big Fish Properties loan for BB&T?
>
> A. That's not what they said to me. They said they were financially disadvantaged.
>
> Q. But are otherwise unable to sustain any further payments on this loan.  I'm asking you in [sic] that statement in your letter, "They are financially disadvantaged and are unable to pay past-due interest late fees and are otherwise unable to sustain further payments on this loan."
>
> A. That's what I wrote, yes.

---

[37] Debtors' Ex. 113; Doc. 78-2, at 68-69, 71.

[38] Doc. 78-1, Trial Tr. Vol. I, at 38; Trustee Ex. 46-69, at 1.  There is some question as to whether the Debtors spent up to $497,329 on the construction of their Current Home.  Although the statement from the general contractor showed a total of $385,595.24, during his deposition Mr. Roberts testified that they had also paid money out-of-pocket for some of the construction.  *Id.* at 39-42.  On the Debtors' 2009 income tax return they reported that the cost of the Current Home was $497,329.00.  Doc. 78-1, at 39-40.  When questioned at trial about the difference between these amounts, Mr. Roberts testified that the $497,329 was put on the tax return by their CPA, and that he believed that this amount represented the purchase price for the lot plus the $385,000 for construction.  Doc. 78-1, at 41.  This latter testimony does not make sense, though, in light of Mr. Roberts' other testimony that he and his wife paid $240,000 for the lot on which they built the Current Home.  Doc. 78-1, at 41. (the purchase price was $240,000 and they put $120,000 down).  $240,000 plus $385,595.24 equals slightly more than $625,000.00.

[39] Doc. 78-2, at 62.

Q. That's not what they told you?

A. No . . . .

. . . .

Q. Okay. I'm asking you, I guess, one, your clients told you that they were financially disadvantaged?

A. As it relates to these loans, yes, they were.

Q. Okay. And, two, did they tell you they were unable to pay the past-due interest and late fees?

A. Unable to pay any further, yes, but only because the bank wouldn't work with them to work out a better solution that they were promised. That's why it's disadvantaged.[40]

Ms. Widman knew when she wrote her letter to BB&T's counsel that the Debtors were building a new home, but had never seen the invoice showing that they had spent more than $385,000 on construction until the day of the trial.[41]  When questioned about that invoice, Ms. Widman testified: "They advised me that they were building the house.  I know that they had a lot of assets at the time, and that's why I chose the word 'disadvantaged' over distressed."[42]  The Court questioned Ms. Widman directly, asking, "What did you mean when [you] used the term 'disadvantaged' if you knew they had assets and had a house under construction?"[43]  Ms. Widman ultimately explained:

[F]inancially disadvantaged meant I couldn't represent that they were distressed. They had too many assets to be distressed.  There [sic] were disadvantaged that they couldn't get anything more than a year of assurance on a big development loan [lot 58 Seabreeze].[44]

On October 1, 2009, the Debtors moved into the Current Home.[45]  That same day, BB&T

---

[40] Doc. 78-2, at 69-71.
[41] *Id.* at 71-73.
[42] *Id.* at 72-73.
[43] *Id.* at 74.
[44] *Id.* at 76.
[45] *Id.* at 36.

filed two law suits against them on account of the Big Fish and JR Investments loans.[46]  On November 20, 2009, the Debtors received a "Certificate of Occupancy" for the Current Home[47] and on November 23, 2009, they recorded a "Declaration of  Domicile" declaring the Current Home as their homestead.[48]

On June 2, 2010, BB&T obtained money judgments against the Debtors in the amounts of $863,715.62 and $149,033.29, respectively, for their obligations on the JR Investments and Big Fish loans.[49]

On September 1, 2009, during the tail end of construction of the Current Home, the Debtors stopped making payments on the mortgage held by SunTrust on their Former Homestead.[50]  This loan originated in 2006, when the Debtors refinanced two existing mortgages and cashed out $148,000 equity in that home.[51]  By November of 2009, when they filed their Declaration of Domicile for their Current Home, the Debtors were two months in default on the SunTrust mortgage.[52]  The Debtors never made any more payments to SunTrust, so on January 25, 2010, SunTrust sued to foreclose.[53]  The Debtors and SunTrust attended a mediation on February 17, 2010, which resulted in an impasse.[54]

On March 3, 2010, about six months after vacating their Former Homestead and moving

---

[46] Doc. 71, ¶ 43. In the Circuit Court in and for Walton County, Florida, under Case Numbers 09-CA-001959 and 09-CA-001957.

[47] Id. at ¶ 45.

[48] Id. at ¶ 46. This Declaration of Domicile was recorded on November 23, 2009, in Official Records Book 2830, at Page 2099-2100 and on November 24, 2009, as amended as to Debtor, Venus Roberts, to correct the address of the Former Homestead in Official Records Book 2830 at Page 2139, all in the Public Records of Walton County, Florida.

[49] Doc. 71, ¶ 58.

[50] Doc. 78-1, at 44-46.

[51] Id. at 27-29.

[52] Doc. 78-2, at 44-46.

[53] Doc. 71, ¶ 48.

[54] Id. at ¶ 52. The Debtors agreed in the Joint Statement of Uncontested Facts (Doc. 71) that this mediation resulted in an impasse.  But, in their Response to the Trustee's proposed Findings of Fact and Conclusions of Law they deny that the mediation resulted in an impasse, and instead say that the mediation resulted in SunTrust agreeing to approve a short sale of the Former Homestead.  Doc. 81, at 4.  Either way, the Debtors and SunTrust did not reach a mediated settlement agreement.

into their Current Home, the Debtors submitted a letter and a complete set of documents to SunTrust requesting approval of a short sale of their Former Homestead.[55]    Among these documents was the "hardship letter" required by SunTrust's "Short Sale Package Requirements."[56] In the "hardship letter" that they both signed, the Debtors represented to SunTrust that due to the "current state of the economy" they were "unable to afford this property [their Former Homestead]."[57]    In that letter, they also represented that the real estate markets had crashed, causing them financial hardship, that Mr. Roberts' income had decreased by about 52% during 2009, and that the value of their Former Homestead and others in "that area" had decreased by about fifty (50%) percent.[58]    The Debtors assert that "[e]ach and every statement in that letter was true and correct on the date it was composed in 2010."[59]

Although the facts in the "hardship letter" regarding the downturn in the real estate market, Mr. Roberts' lower income, and reduced values of homes in the area may have been accurate, the letter did not tell SunTrust the whole story, nor did it always state the truth.    The context of the letter and the omitted facts are critical.    Of particular significance, in the hardship letter the Debtors did not disclose that the reason they were "unable to afford this property" was because by that time they had liquidated their non-exempt assets and used them to build their Current Home.    At no time did the Debtors disclose to SunTrust that during the months between their first inquiry about a short sale and the short sale closing they were spending, or had spent, more than $385,000

---

[55] Doc. 78-1, at 32-33, 36.  This was the first action the Debtors took regarding the short sale that they had inquired about in July of 2009, while they were still residing in the Former Homestead.

[56] *Id.* at 32-33. The "Short Sale Package Requirements" included a requirement that the Debtors provide a "signed and dated hardship letter" defined as "an explanation of why the homeowner is unable to pay the mortgage".  Trustee Ex. 46-54, 1-2; Trustee Ex. 45-27 & Debtors' Ex. 105.  Mr. Roberts confirmed that this letter constituted the "hardship letter" required by SunTrust. Doc. 78-1 at 33.

[57] Debtors' Ex. 113.

[58] *Id.*  They asked SunTrust to make a "quick decision" on approving the short sale because, according to them, the potential buyer's loan was only good for approximately six (6) weeks.

[59] Doc. 81 at 4.

building a new home just down the street.  Nor did the Debtors disclose to SunTrust until the day of closing the short sale that they had moved out of the short sale property and into a home worth in excess of $400,000.[60]  In the hardship letter, the Debtors represented to SunTrust that Mr. Roberts' reduced income and the market downturn "forced" them to "become delinquent" on the Big Fish and JR Investments loans with BB&T.[61]  This was not true.  The total amount needed to cure both loans in August of 2009, in the middle of their liquidation of assets, was only about $14,000.00.[62]  The Debtors had the financial ability to cure their defaults on the BB&T loans when they became delinquent, they simply chose not to.[63]

A SunTrust corporate representative, Mr. Steven M. Harris, testified at trial that in its consideration of the short sale SunTrust would like to have been provided with information relevant to the Debtors having moved to a new residence.[64]  He further testified that SunTrust had not been provided with copies of the Certificate of Occupancy, Declaration of Domicile, or itemized statement for construction of the new residence.[65]  According to Mr. Harris, this information would have been relevant to SunTrust in its consideration of the short sale because it "discloses to SunTrust and to our investor that the borrower may have had the ability in some capacity to either pay their loan in full or pay a portion of the deficiency balance . . . ."[66]  Mr. Harris explained SunTrust's need for the Debtors' financial information in approving a short sale as follows:

---

[60] The Debtors argue that SunTrust somehow knew they had relocated because some of SunTrust's mail was delivered to the Debtors' new home.  Doc. 78-1, at 22, 57-58.  The facts that the Debtors might have provided SunTrust with a new mailing address, so correspondence went to the Current Home, does not equate with revealing details about that home, or how much they spent to build it.

[61] Debtors' Ex. 105.

[62] Doc. 78-2, at 68-70.

[63] They testified that their defaults to BB&T and SunTrust were strategic. Doc. 78-2, at 28.

[64] Doc. 78-1, at 76; 78-3, at 26-27.  Mr. Harris testified via a videotaped deposition taken for the purpose of trial.  Mr. Harris is the Group Vice President over loss mitigation at SunTrust Bank.

[65] Doc. 78-3, SunTrust Mortgage Tr. at 13-17, 25, 27-29.

[66] *Id.* at 29.

> As part of our short sale review, we review the borrowers' financial profile. That includes their income and any asset structures that they may have. We do an analysis to determine the borrowers' hardship, and/or ability or capacity to be able to repay the debt, and/or potentially contribute in some capacity toward the deficiency being considered.[67]

After seeing the documents pertaining to the Current Home for the first time on direct examination, Mr. Harris testified that he did not feel as though SunTrust was provided a full and accurate reflection of the Debtors' financial position in conjunction with their request for a short sale.[68]

The Debtors argue that they put SunTrust "on notice" and that it was "fully aware" that they owned "another homestead."[69]  As proof, they point to a financial statement they provided to SunTrust during the February 2010 foreclosure mediation, on which they listed the Current Home as "313 Amelia Lane (house)" with a value of $550,000.[70]  But, that same financial statement, on which assets are on one page and liabilities on another, reflected the Debtors' net worth as negative $280,446.30.[71]  Nowhere does this financial statement list the Current Home as "another homestead;" certainly not as the home in which they were residing and for which they had filed a Declaration of Domicile.[72]  There is no evidence that the Debtors revealed to SunTrust, either at mediation or prior to the short sale, how much they had liquidated with which to build the Current Home, or that they did so just before they defaulted on the SunTrust loan.  Further, pointing to an email exchange between them and SunTrust on the morning of the short sale closing, the Debtors argue that SunTrust had "explicit" notice of their Current Home and could have chosen to cancel

---

[67] *Id.* at 19.

[68] *Id.* at 83.  The Debtors' argument that Mr. Harris' testimony should be discounted or discredited altogether because he was not the SunTrust representative who handled the short sale and did not participate in its negotiations is unpersuasive.  The Debtors did, as they point out, list the Current Home on their 2010 Financial Statement, provided to SunTrust during the foreclosure mediation.  *See* Doc. 81, at 2-3.  But, there is no evidence that they told the SunTrust representative how much they had liquidated with which to build the Current Home while, or just before, they defaulted on the SunTrust loan.

[69] Doc. 81 at 2.

[70] *Id.* at 2-3; Debtors' Ex. 104.

[71] Debtors' Ex. 104.

[72] *Id.*

12

the sale.[73] What the Debtors did not tell SunTrust, though, was that the Current Home was costing them over $385,000 to build, and the reason the payments on their Current Home were less than those to SunTrust was because they had paid cash to build that home.

SunTrust's willingness to consider a short sale was centered on the property (the Former Homestead) still being the Debtors' home, and the Debtors' inability to pay for that home. The language on the SunTrust statements that caused the Debtors to inquire about a possible short sale states: "Why risk losing *your home* when one phone call might save it? Please call . . . ."[74] A letter from SunTrust to the Debtors dated October 19, 2009, stated:

> Please call us. Together we may be able to save *your home*. . . . If you *cannot afford the home* and a sale will not allow you to pay off the loan, we may accept less than the total amount you owe us.
> . . . .
> You'll need to complete the enclosed financial form and send it along with the documentation below to SunTrust Mortgage.[75]

When questioned at trial about whether he and his wife had represented to SunTrust that their Former Homestead was still their primary residence during the short sale negotiations, Mr. Roberts denied that the term "primary residence" ever came up during his discussions with SunTrust.[76] Mr. Roberts initially testified at trial that he did not understand the terms "primary homestead residence" or "primary residence,"[77] but later in his testimony he grudgingly admitted that during

---

[73] Doc. 81 at 2.
[74] Debtors' Ex. 97 (emphasis added).
[75] *Id.*
[76] Doc. 78-1, Trial Tr. Vol. I, at 55.
[77] Mr. Roberts testified that he did not use the term "primary residence" with regard to his seeking approval of the short sale. Doc. 78-1, at 58. But this testimony was refuted by Mr. Roberts' previous sworn testimony during the 341 meeting. The audio from the 341 meeting, admitted into evidence as Trustee's Ex. 44, show that Mr. Roberts testified to the Trustee as follows:
    [Trustee]: Who was the mortgage company?
    Mr. Roberts: SunTrust.
    [Trustee]: Did they waive a deficiency, or did they—
    Mr. Roberts: I don't know if they did waive a deficiency. I believe not — or something happened. It was our primary, and we didn't — we haven't had to pay a deficiency fee.
    [Trustee]: How much short was it?

the 341 meeting he had provided sworn testimony to the Trustee that the short sale did involve his "primary residence."[78]

By applying for a short sale after moving out of their Former Homestead on which SunTrust held its mortgage, the Debtors, at least by implication, led SunTrust to believe that the short sale application was for their then primary residence. Although Mr. Roberts testified that "[w]e represented [to SunTrust] we lived there, and we were moving out, and we had moved out,"[79] in fact, there is no evidence that the Debtors told SunTrust that they had moved out of the Former Homestead until the day of closing on the short sale, in answer to an email from SunTrust's representative.[80] By this date, the Debtors had been living in their Current Home for over six months.[81]

The Debtors deliberately and strategically defaulted on their payments to SunTrust after moving into their Current Homestead.[82] Ultimately, SunTrust approved and the Debtors closed on a short sale of their Former Homestead in April of 2010; as a result, SunTrust forgave and canceled the remaining indebtedness due in the amount of $205,570.97.[83] The Debtors received a federal income tax exemption on the basis that $205,570.97 of debt forgiveness was related to a

---

Mr. Roberts: Couple hundred thousand. It was our primary residence.
Doc. 78-1, Trial Tr. Vol. I, at 62.

[78] *Id.* at 63 (describing the Debtors' Former Homestead). Mr. Roberts also maintained at trial that he did not know what a short sale was before receiving information from SunTrust in July of 2009: "The short sale came about because they [SunTrust] sent me a letter. At the time there – as a real estate broker, I'd never even heard of the term 'short sale.' So in 2009 especially was the year that banks educated real estate brokers, closing companies and the public in general about what a short sale is." Doc. 78-1, at 50-51.

[79] *Id.* at 54.

[80] Doc. 78-2, at 36-37. They told SunTrust that their new housing expense, after moving out of their Former Homestead, which SunTrust believed was still their "primary home," was only $2,100.00 per month. *Id.* They did not tell SunTrust that this low amount was because they had liquidated their assets and paid cash to build their new home.

[81] Doc. 74, at 11. The Debtors' Former Homestead was sold via short sale on April 14, 2010.

[82] Doc. 78-2, at 32.

[83] *See* Form 1099-C, Trustee Ex. 46-12, at 9-10.

"primary home."[84]  Mr. Roberts admitted that the Debtors could have paid this deficiency to SunTrust, except that by the time the short sale closed in April of 2010, they had put all of their money into building their Current Home.[85]

Before the short sale, the Debtors raised a portion of the cash with which to build their Current Home by selling a vacant lot owned by Big Fish to a family trust of which Mr. Roberts' mother is the beneficiary.[86]  They raised more of the cash with which to build their dream home by selling their Sea Ray boat, which they still use, to Mr. Roberts' mother's trust for $50,000.00.[87]  When they sold the Big Fish lot and used that cash to help build the Current Home, the Debtors were in default on the Big Fish loans with BB&T; construction of their Current Home was about fifty percent complete.[88]

The Debtors argue that their good intent—to build their dream home and not to hinder, delay or defraud their creditors—is proven because the value of Lot 58 Seabreeze, collateral for the JR Investments loan, was always higher than the debt to BB&T.[89]  For this reason, they argue, they were not rendered insolvent by their transfers, nor did they owe any money to BB&T on an unsecured basis at the time of the transfers.  To prove that there was always equity in Lot 58 Seabreeze the Debtors point to appraisals of that property that showed values ranging from $6.112 million in 2005 to $1.680 million in February of 2009.[90]  But these appraisals were based upon construction and development that the Debtors never completed.[91]  And one of the Debtors' own

---

[84] Debtors' 2010 federal tax return, including IRS Form 982, which excludes from gross income the $205,570.97 of debt forgiveness related to the "principal residence."  Trustee Ex. 31, at 16.  The Debtors attributed this terminology to their accountant.

[85] Doc. 78-1, at 51.

[86] *Id.* at 69.

[87] *Id. see also,* Joint Statement of Undisputed Facts, Doc. 74, at 8.

[88] Doc. 78-1, at 70-71.

[89] Doc. 78-2, at 28, 31; Doc 74, ¶¶ 12, 18, 22.

[90] *Id.*

[91] Doc. 74, ¶¶ 12, 18, 22. Debtors' Ex. 10, 11, 12.  The $6.112 million appraisal was subject to approval of a 32 unit condominium development. Debtors' Ex. 10, at 60.  The $1.6 Million appraisal was subject to approval of a 14 home

financial statements reflected a value for Lot 58 Seabreeze in February of 2010 of only $300,000.[92]
By the time they defaulted on the BB&T loans, the Debtors had been attempting unsuccessfully to
develop Lot 58 Seabreeze for more than five years.[93]  By the time BB&T foreclosed, the revised
appraisal showed a value of $250,000 based on construction of four units.[94]  Post-foreclosure,
BB&T sold Lot 58 Seabreeze to an investor for $135,000.[95]

Conclusions of Law

In 2005, Congress added Subsection (o) to 11 U.S.C. § 522 of the Bankruptcy Code.
Section 522(o)(4), at issue here, provides:

> (o) For purposes of . . . [homestead exemptions], the value of an interest in
> . . . .

> (4) real or personal property that the debtor or dependent of the debtor
> claims as a homestead;

> shall be reduced to the extent that such value is attributable to any portion of *any
> property that the debtor disposed of* in the 10-year period ending on the date of the
> filing of the petition *with the intent to hinder, delay, or defraud a creditor* and that
> the debtor could not exempt, or that portion that the debtor could not exempt, under
> subsection (b), if on such date the debtor had held the property so disposed of.[96]

Congress' enactment of Section 522(o) was prompted in large part by Florida's "virtually
limitless" homestead law.[97]  "Sections 522(o) and 522(p) limit a debtor's homestead exemption
in bankruptcy, notwithstanding that the same exemption would be unlimited under state law had

---

townhome development. Debtors' Ex. 12 at 68.  Neither of the developments contemplated in these appraisals were
ever completed by the Debtors.

[92] Doc. 78-2, at 49-50; Trustee Ex. 13 at 99-100.  Mr. Roberts testified at trial that when they listed $300,000 as the
value for this asset on their February 2010 financial statement, they really meant that $300,000 was the net equity in
the property, not the total value.  Doc. 78-2, at 49-50.

[93] Doc. 78-2, at 46.

[94] *Id.* at 40.  Mr. Roberts testified that he did not "agree" with this appraisal.

[95] *Id.* at 41.  According to Mr. Roberts, the investor later sold the property for $1.080 million in July of 2014, based
on a subdivision containing eight (8) lots.  *Id.*  But no one gave any evidence of what the ultimate buyer of Lot 58
Seabreeze did, or how much it spent, to be able to re-sell that property for over one million dollars.

[96] 11 U.S.C. § 522(o)(4) (2015) (emphasis added).

[97] *In re Cook*, 460 B.R. 911, 912 (Bankr. N.D. Fla., 2011), *vacated, Centennial Bank v. Cook, No 12-00008-MP-GRJ*
(N.D. Fla. Sept. 26, 2012), *on remand*, *In re Cook*, No. 11-50287-KKS (Bankr. N.D. Fla. Dec. 02, 2013) (Doc. 320);
*In re Garcia*, No. 09-33208-LMI,  2010 WL 2697020 (Bankr. S.D. Fla. 2010).

the debtor not filed bankruptcy."[98]   By virtue of the Supremacy Clause of the United States

Constitution, Section 522(o) preempts Florida's constitutional homestead exemption.[99]

Section § 522(o)(4) requires the Debtors' homestead exemption to be reduced to the extent

that Debtors converted non-exempt assets into the claimed homestead within ten (10) years before

the bankruptcy filing, if the transfer was done with the intent to hinder, delay, or defraud a

creditor.[100]   In considering a Debtor's claim of homestead exemption in light of Section 522(o)(4),

this Court has previously written:

> In order to prevail on their § 522(o)(4) objections the [objecting parties]
> must prove by a preponderance of the evidence that the [debtor's] intent . . . was to
> hinder, delay, or defraud a creditor.   In determining the factual issues this Court
> must view the evidence in the light most favorable to the Debtors.   "The homestead
> exemption should be carried out in a liberal spirit in favor of those entitled to the
> exemption.   Exceptions to the exemptions should be strictly construed against the
> party challenging the exemption."[101]

As the objecting party, the Trustee has the burden of proving by a preponderance of the

evidence that the Debtors intended to defraud their creditors when they transferred non-exempt

assets into their current homestead.[102]   Congress did not define the phrase "intent to hinder, delay,

or defraud a creditor."[103]   Traditionally, courts have used the "badges of fraud" to determine such

intent in other sections of the Bankruptcy code where similar language is used.[104]   Courts have

---

[98] *In re Cook*, No. 11-50287-KKS (Bankr. N.D. Fl. Dec. 02, 2013) (Doc. 320, at 8).
[99] *In re Garcia*, 2010 WL 2697020 (Bankr. S.D. Fla. 2010) (citing *In re Weinstein*, 164 F.3d 677, 683 (1st Cir. 1999) ("[T]he state's ability to define its exemptions is not absolute and must yield to conflicting policies in the Bankruptcy Code."); *In re Maddox*, 15 F.3d 1347, 1351 (5th Cir. 1994) (holding that lien avoidance under § 522(f) is not limited by state exemptions); *In re Opperman*, 943 F.2d 441, 443 (4th Cir.1991) (limitation in North Carolina homestead statute is invalid to the extent it conflicts with operation of § 522(f)); *accord In re Osejo*, 447 B.R. 352, 354 (Bankr. S.D. Fla. 2011) (Florida homestead protections are preempted by federal bankruptcy law to extent debtor converted nonexempt property with intent to hinder, delay or defraud her creditors).
[100] 11 U.S.C. § 522(o)(4).
[101] *In re Cook*, No. 11-50287-KKS, Doc. 320, at 9 (citing to *In re Snape*, 166 B.R. 184, 187 (Bankr. M.D. Fla. 1994)).
[102] *In re Cook*, No. 11-50287-KKS (Doc. 320 at 9); *see also In re Klinglesmith*, No. 6:10-BK-00416-KSJ, 2011 WL 2471582, at *1 (Bankr. M.D. Fla. June 2, 2011).
[103] *Id.*
[104] 11 U.S.C. §§ 548(a)(1)(A) and 727(a)(2); *In re Addison*, 540 F.3d 805, 811-12 (8th Cir. 2008).

looked to the case law addressing § 548(a)(1)(A) and § 727(a)(2) when addressing an objection to a homestead exemption under Section § 522(o)(4).[105]

The Eleventh Circuit has identified the following badges of fraud: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was not disclosed or concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the Debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[106]

Courts have held that there must be extrinsic evidence of fraud, in addition to the badges of fraud themselves, to support a finding of intent to defraud.[107] The Trustee argues that in the Eleventh Circuit extrinsic evidence of fraud is no longer required, citing to *In re Kane*.[108] The Debtors disagree with the Trustee's interpretation of *In re Kane,* pointing out correctly that *Kane* involved an objection to discharge under Section 727 of the Code, and not an objection to a debtor's homestead exemption under Section 522(o)(4). Neither party's interpretation of *Kane* is entirely correct.

In *Kane,* the debtor lawyer was found to have committed a fraud on the bankruptcy court:

---

[105] *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009) (citing to *In re Addison*, 540 F.3d at 811).
[106] *In re XYZ Options, Inc.*, 154 F.3d 1262, 1272 (11th Cir. 1998).
[107] *Clark v. Wilmoth (In re Wilmoth),* 397 B.R. 915, 920 (8th Cir. B.A.P. 2008); *In re Booth*, 417 B.R. at 823; *In re Addison*, 540 F.3d at 811-12 ("Before actual fraudulent intent can be found 'there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose.'").
[108] 755 F.3d 1285 (11th Cir. 2014).

as one of two general partners of a law firm that was itself a Chapter 11 debtor, the debtor lawyer

caused the law firm to pay $30,000 of real estate taxes on his personal property.[109]   He did so

knowing that dismissal of the Chapter 11 was imminent, and to avoid a garnishment of the law

firm's bank accounts that all parties knew would follow dismissal of the Chapter 11.[110]   In

affirming denial of the debtor lawyer's discharge under 11 U.S.C. § 727(a)(2) and (a)(7), the

Eleventh Circuit in *Kane*, quoting from its prior opinion in *In re Jennings*,[111] held:

> "We review for clear error the bankruptcy court's factual determination that a debtor intended to hinder, delay, or defraud a creditor." . . . "Deference to the bankruptcy court's findings is particularly appropriate" in this context "because the intent determination will often depend on that court's assessment of the debtor's credibility." (internal quotation marks omitted).   On this record, we find no clear error in the bankruptcy court's assessment of [the debtor's] intent.   To block a debtor's discharge pursuant to § 727(a)(2), a creditor is not required to adduce *direct evidence* of a debtor's bad intent. . . .   "Since it is unlikely that a debtor will admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by circumstantial evidence *or inferred from the debtor's course of conduct*." . . .   Here, the bankruptcy court's determination of [the debtor's] bad intent was amply supported by circumstantial evidence and inferences drawn from that evidence.[112]

 The court recited specific record facts, including a "telling" colloquy between the debtor's lawyer

and the bankruptcy court at a hearing.[113]   It then juxtaposed the facts against the debtor's testimony

and found:

> [T]he bankruptcy court found [the Debtor] not to be credible.   There was no clear error in the bankruptcy court's finding that [the debtor] "knew of" the bankruptcy court's May 20 ruling and "caused the Firm to pay his personal real estate tax obligations with the intent to hinder and delay the [creditors]."   The evidence supports the inference drawn by the trial judge that [the debtor]—anticipating the garnishment . . . —appropriated the . . . funds while he still could.[114]

---

[109] *Id.* at 1291 (the debtor lawyer caused this transaction two days after the bankruptcy court had orally and in writing granted the judgment creditor's motion to dismiss the Chapter 11 as a bad faith filing, and in direct violation of another order that specifically restricted distributions of the law firm to the debtor and his son).

[110] *Id.*

[111] *In re Jennings*, 533 F.3d 1333 (11th Cir. 2008).

[112] *In re Kane*, 755 F.3d at 1298 (emphasis added) (citations omitted).

[113] *Id.*

[114] *Id.* at 1299 ("Against all of this evidence of bad intent, [the debtor] offers only his own testimony" that he did not know the transfer was prohibited and that he tried to reverse the transfer after he realized his "mistake.").

This conclusion is entirely consistent with the result and analysis in *In re Jennings*.[115]  In that case, nine days before filing bankruptcy and shortly after a verdict of over $21 million was entered against him, a Chapter 11 debtor paid $130,000 to a homebuilder constructing an addition to his home.[116]  This amount was $85,000 more than the debtor owed the builder at the time.[117]  At trial, the debtor testified that he negotiated the terms and purposes of this payment with the builder, but this testimony was "contradicted" by the builder.[118]  The debtor also testified that he made the advance payment to accelerate construction of another project, to lower the costs of the other project, and so that he would not "be burdened by the project while attending trial in California."[119]  The debtor contended that he paid the $130,000 to the builder in an attempt to utilize the homestead exemption available to him under Florida law, not to keep the money from his creditors.[120]  The bankruptcy court found the debtor's "non-fraudulent" explanation for the transfer to be not credible and concluded that the debtor intended "to keep the money out of the hands of his creditors" rather than to jump start or save money on the other project.[121]  The district and Eleventh Circuit courts affirmed the denial of the debtor's discharge.  In so doing, the district court agreed that the debtor's "less than candid . . . testimony" regarding the transfer constituted

---

[115] *In re Jennings*, 533 F.3d at 1337.
[116] *Id.*
[117] *Id.*  The premature payment was made on May 5, 2003, and the California Court entered a judgment against the debtor on May 13, 2003. The debtor filed bankruptcy on May 14, 2003.
[118] *Id.* at 1339.
[119] *Id.*
[120] *In re Jennings*, 533 F.3d at 1338.
[121] *Id.* at 1340. The court concluded that:

> [T]he record contain[ed] ample evidence of [the debtor's] actual intent to defraud his creditors by making a premature payment on a contract for improvements to part of his Florida homestead. [The debtor] unilaterally determined the amount of the payment, which greatly exceeded the amount then due under the contract, [he] realized no savings and received no other benefit as a result of the payment, almost no work had been done on the project when the payment was made, and [he] could not convincingly explain the rationale behind his decision to make the payment.

*Id.* at 1342.

sufficient extrinsic evidence upon which to base a finding of actual fraudulent intent.[122]

The Eleventh Circuit in *Kane* did not deviate from its reliance on the "badges of fraud" to prove intent to hinder, delay, or defraud creditors, nor did it rule that extrinsic evidence of a debtor's subjective intent is no longer necessary.  Rather, by recognizing the unlikelihood that a debtor will ever admit that he or she acted with intent to hinder, delay, or defraud creditors, which would be "direct" evidence, the Eleventh Circuit reaffirmed that pretty much the only way to prove a debtor's intent is to present actual evidence of the events and the debtor's course of conduct, along with the debtor's testimony and the testimony of other witnesses.[123]

A finding of fraudulent intent generally requires that there "'appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose.'"[124]  Extrinsic evidence of fraud can include conversion of a large amount of property, "conduct intentionally designed to materially mislead or deceive creditors about the debtor's position or use of credit to buy exempt property," or conveyance of property for no or inadequate consideration.[125]

The Trustee asserts that evidence of the following facts is sufficient proof that the badges of fraud are present here.  The Debtors: liquidated substantial non-exempt assets to fund the construction of their Current Home; retained possession of these assets in the form of the equity in the Current Home and, at least with respect to the Sea Ray boat, continued use and enjoyment; did not disclose these transfers or the value of and equity in their Current Home to SunTrust when they continued with a short sale of their Former Homestead and received forgiveness of about

---

[122] *Id.* In addition, the district court found that the record evidence supported the bankruptcy court's determination that "the timing of the transaction and [the debtor's] unilateral decision concerning the amount of funds to transfer pointed to a wrongful intent." *Id.*

[123] *Id.*; *see also In re Jennings*, 533 F.3d at 1339; *In re Lakey*, No. 09-22538, 2010 WL 8985033, at *6 (Bankr. D. Kan. Oct. 4, 2010) *aff'd sub nom; Wolters v. Lakey*, 456 B.R. 687 (D. Kan. 2011).

[124] *In re Lafferty*, 469 B.R. 235, 247 (Bankr. D.S.C. 2012) (quoting *In re Addison*, 540 F.3d 805, 813 (8th Cir. 2008).

[125] *Id.*

$250,000 in debt; misled SunTrust by failing to disclose that their inability to pay the SunTrust mortgage was caused entirely by the liquidation of their assets for construction of their Current Home, and that they defaulted on their SunTrust loan while in the process of transferring these assets and building their Current Home; became insolvent upon making the transfers;[126] transferred substantially all of their.  Before and during the transfers the Debtors had significant financial exposure to BB&T and SunTrust.[127]  The Debtors claimed, via their attorney, that they were "financially disadvantaged," but failed to tell their attorney how much money they had raised by liquidating assets, or how much money they had put into construction of their Current Home; they renewed the BB&T Loans for a two year period, but all indications are that they never intended to re-commence making the loan payments.  The BB&T renewals gave the Debtors time to use the proceeds from their liquidation of their assets and finish construction on the Current Home before BB&T could find out about their financial affairs post-default.  As a result of the Debtors' transfers, their balance sheet went from several hundred thousand dollars' worth of non-exempt assets to $0.  When coupled with the Debtors' testimony and demeanor, these facts support a finding that the Trustee has met his burden of proof of the Debtors' intent to hinder, delay or defraud.

The facts here are very different from those in *In re Addison,* where the Eighth Circuit reversed the bankruptcy court's reduction of the debtors' homestead exemption under Section 522(o).[128]  In *Addison,* the debtor was being pursued on a $1.3 million personal guaranty.  After

---

[126] This fact is shown by comparing the Debtors' Financial Statements.  Their pre-construction Financial Statement dated December 23, 2008, reflects their total net worth to be $1,025,762.  Their post-construction Financial Statements, dated February 2010 and March 3, 2010, reflect negative net worth, respectively, of $255,692.86 and $280,466.30.  *See* the Financial Statements of December 23, 2008 & February 2010 attached as Ex. 1 and Ex. 3, which are attached to the deposition of Mr. Roberts admitted as Trustee Ex. 13, and the Financial Statement of March 3, 2010, submitted to SunTrust Mortgage and admitted into the record as Debtors' Exhibit 104.

[127] Not only did the Debtors testify that they strategically defaulted on these loans, but as to BB&T they declined the opportunity to cure their defaults, even though they had the wherewithal to do so.

[128] *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 815 (8th Cir. 2008).  Unlike this case, the debtor in *Addison* did

consulting with bankruptcy counsel the debtor transferred $8,000 into Roth IRAs for himself and his wife; he caused his wife to make a principal reduction of $11,500 on his homestead.[129]  The bankruptcy court sustained the Trustee's objection under Section 522(o), reducing the debtors' homestead by $11,500 and disallowing the Roth IRA exemptions, and the Eighth Circuit B.A.P. affirmed.[130]  Emphasizing that the debtor only liquidated some, rather than all, of his non-exempt assets (the Roth IRA money was taken from a brokerage account containing over $45,000), the Eighth Circuit court reversed, holding that the record contained no "extrinsic evidence of intent to hinder, delay, or defraud a creditor sufficient to uphold the bankruptcy court's finding."[131]  The court said:

> 'The sort of indicia of fraud necessary to find fraudulent use on [sic] an exemption would be, *inter alia*, conduct intentionally designed to materially mislead or deceive creditors about the debtor's position or use of credit to buy exempt property.' . . .  Additionally, '[c]onverting a very great amount of property could also be an indication of fraud,' as could '[t]he existence of conveyances for less than adequate consideration.'[132]

The *Addison* court concluded that the record indicated that the debtor's intent was to convert only some, rather than all, of his nonexempt property to exempt property on the eve of bankruptcy, and noted that it is "well established" in the Eighth Circuit that debtors may engage in such conduct.[133]  Significantly, the *Addison* court compared this result with a prior case in which it had upheld a bankruptcy court's finding of intent to defraud, stating:

> It is one thing to convert non-exempt assets into exempt property for the express purpose of holding it as a homestead and thereby putting the property beyond the reach of creditors.  However, it is quite another thing to acquire title to a house for

---

not attempt to convert "almost his entire net worth" in exempt assets prior to bankruptcy.  Rather, [the debtor] left substantial nonexempt assets for his creditors to recover.
[129] *Id.* at 808.
[130] *Id.*
[131] *Id.* at 817.
[132] *Id.* at 816 (citations omitted).
[133] *In re Addison*, 540 F.3d at 816.  This Court has also ruled similarly in *In re Cook*, No. 11-50287-KKS (Bankr. N.D. FL. Dec. 02, 2013) (Doc. 320).

no other reason than to defraud creditors.[134]

The Debtors here acquired a new home with previously non-exempt assets. The Trustee has proven the existence of several badges of fraud. The evidence shows that the Debtors engaged in a pattern of conduct designed to, at minimum, obfuscate the truth in their dealings with BB&T, SunTrust, and the Trustee. The Debtors' actions and testimony combine to show that they liquidated their assets in order to acquire a valuable exempt homestead that they did not have before, with the purpose of hindering, delaying or defrauding their creditors. The hardship letter to SunTrust Bank contains half-truths and statements designed to misinform the reader as to the Debtors' then financial situation and the events leading up to it. These Debtors did not just convert some of their non-exempt to exempt property, they converted it all. Although the presence of some badges of fraud does not necessarily establish bad intent, "a confluence of badges can constitute conclusive evidence of an actual intent to defraud."[135]

Like in *Jennings*,[136] the decision here boils down to whether, in spite of the evidence, I believe the Debtors' testimony: that they had no intent to hinder, delay or defraud anyone, and that they liquidated assets and built their "dream home" on a lot they had owned for years only because the wife finally found an architect she liked and their children were older. I do not.

---

[134] *In re Addison*, 540 F.3d at 816. (citing *In re Sholdan*, 217 F.3d 1006, 1011 (8th Cir. 2000)).

[135] *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009). The Debtors here admit that their actions could be perceived to have defrauded two creditors, SunTrust and BB&T: "The Debtors' actions at best could have been done to hinder, delay or defraud only two creditors: SunTrust and BB&T. The Debtors were current on all other debts and remained current on all other debts but BB&T when the Debtors stopped making payments on June 26, 2009, and SunTrust, to whom Debtors stopped making payments to on September 1, 2009." Debtors' Findings of Fact and Conclusions of Law, Doc. 77, at 15. They claim, though, that because all but one of the real estate transfers that resulted in money going into their Current Home were done while they were "current, up to date and in good standing on all of their debts and obligations," and because no lawsuits were filed against them until after they had moved into their homestead in October 2009, the Trustee cannot prove that they had intent to hinder, delay or defraud BB&T or SunTrust. *Id.* at 17.

[136] *In re Jennings*, 533 F.3d 1333 (11th Cir. 2008).

The Debtors renewed the BB&T loans for a two year period.[137]  They defaulted on the renewed loans shortly after renewing them.[138]  Meanwhile, they were actively transferring all of their assets into their new homestead.[139]  Although the Debtors claim that they "believed" or "knew" that the property securing their debts to BB&T had significant equity, they knew that BB&T had already refused their offer to deed that property back in lieu of foreclosure.[140]  The Debtors did not disclose to SunTrust, BB&T or their own lawyer that they were upgrading from the Former Homestead, with a total area of 3,606 square feet, to a new, waterfront, home with a total area of 5,500 square feet.[141]

At trial and during questioning by the Trustee at the § 341 meeting Mr. Roberts' testimony was evasive and, at times, purposely obtuse.  This lack of candor, along with the timing of the material transactions, and the accumulation of misrepresentations and half-truths to various parties along the way, convinces this Court that the Debtors' testimony— that their only goal was to build their "dream home" for their family at long last —is not to be believed.  The Debtors' construction of their "dream home" under these facts and circumstances, and at such a critical time in their financial lives, is simply too fortuitous to be coincidental.

The Debtors here made choices.  They chose to default on the SunTrust loan, even though they could have continued making payments had they not built their Current Home.  They chose to default on the BB&T loans, even though at the time they had plenty of assets and money with

---

[137] A little over a month before starting construction on the Current Home, the Debtors entered into a two year renewal of the JR Investments, LLC loan in the principal amount of $750,000.00.  Doc. 71, ¶ 24.  Twelve days after beginning construction of their current homestead on the Current Home the Debtors entered into a two year renewal of the Big Fish Properties, LLC loan.  Doc. 71, ¶ 27.

[138] Doc. 71, ¶ 36. On June 27, 2009, Debtors monetarily defaulted under both of the loans to JR Investments, LLC and Big Fish Properties, LLC.

[139] *Id.* at ¶¶ 21, 23, 25, 31, 32, 51.

[140] *See* Debtors' Ex. 113; Doc. 81, at 8-10.

[141] Trustee Ex. 24 & 25.

which to bring those loans current. They chose to sell their Sea Ray boat and one lot to family trusts. They chose to use all of their non-exempt assets to build their dream home rather than reduce their debt to SunTrust and BB&T. Then, they chose to file this bankruptcy. Choices come with consequences. The consequence here will be the reduction of the Debtors' homestead exemption.

For the reasons stated, and based on the evidence, it is

ORDERED:

1. The Trustee's Objection to the Debtors' Homestead Exemption (Doc. 37) is SUSTAINED.

2. The Debtors' homestead exemption is reduced, pursuant to 11 U.S.C. §522(o), by $394,875.28, comprised of the amounts the Debtors received from their sales of the four properties and the money from their Regions Bank Money Market Account.

DONE and ORDERED on   this the 11th day of March, 2015   .

Karen K. Specie
United States Bankruptcy Judge

cc: all interested parties.